Timothy Patrick **CHAMBERS**, petitioner, Appellant,

v.

**STATE of Minnesota, Respondent.**

No. A11–1954.

Supreme Court of Minnesota.

May 31, 2013.

314

Michael C. Davis, Saint Paul, MN; and David W. Merchant, Chief Appellate Public Defender, Leslie Rosenberg, Assistant State Public Defender, Saint Paul, MN, for appellant.

Lori Swanson, Attorney General, Saint Paul, MN; and G. Paul Beaumaster, Rice County Attorney, Benjamin Bejar, Nathaniel Reitz, Assistant Rice County Attorneys, Faribault, MN, for respondent.

## OPINION

DIETZEN, Justice.

Appellant Timothy Chambers was found guilty by a Rice County jury of first-

degree murder and related charges arising out of a motor vehicle collision that occurred on May 3, 1996, in which a deputy sheriff was killed. The district court sentenced Chambers on the first-degree murder conviction to a mandatory sentence of life imprisonment without the possibility of release. We affirmed Chambers' conviction and sentence on direct appeal, concluding, among other things, that his life sentence did not violate the Eighth Amendment to the United States Constitution. In 2007, Chambers filed a petition for postconviction relief, which the postconviction court denied. We affirmed the postconviction court on appeal. In May 2011, Chambers filed a second petition for postconviction relief, alleging that his sentence was unconstitutional under the Eighth Amendment. The postconviction court denied Chambers' petition without an evidentiary hearing, concluding that the petition was time barred under Minn.Stat. § 590.01, subd. 4 (2012), and that none of the exceptions to the time bar applied. On appeal, Chambers relies upon recent decisions of the United States Supreme Court to support his argument that his sentence violates the Eighth Amendment, and that those cases satisfy an exception to the time bar under Minn.Stat. § 590.01, subd. 4(b)(3). Because we conclude that the cases upon which Chambers relies are either not applicable to Chambers, or do not apply retroactively to him, we affirm the postconviction court's denial of the petition.

On May 3, 1996, 17–year–old Timothy Chambers walked to the Priordale Mall in Prior Lake to fill out a job application. As Chambers was leaving the mall, he saw a parked Lincoln Town Car with the keys inside. Chambers took the Lincoln and drove it away from the mall. The Lincoln's owner reported it stolen shortly after Chambers took it, and Chambers was soon stopped by Deputy Donald Buchan of the Scott County Sheriff's Department. When Buchan exited his squad car, Chambers drove the Lincoln into Buchan's car and then drove away. Buchan and other officers pursued Chambers for over 30 miles. During the pursuit, Chambers caused the Lincoln to bump against Buchan's squad car, drove through several red lights, and then hit a truck stopped at an intersection. When Chambers reached I–35, he turned south and operated the vehicle at speeds of 90 to 110 miles per hour. Near the Dakota/Rice County border, two semi-trucks blocked both lanes on I–35 in an attempt to slow Chambers, but he avoided the trucks by driving into the median and then exiting I–35.

At the top of the exit ramp, Rice County Deputy Sheriff John Liebenstein set up a roadblock with his unmarked squad car. Liebenstein left space for other vehicles to go around the roadblock. According to eyewitness testimony, when Chambers drove up the exit ramp toward the roadblock, he accelerated the Lincoln and hit the unmarked squad car on the passenger side between the front and rear wheels. It was unclear whether Liebenstein was seated in the squad car or standing outside it; but following the collision, Liebenstein was found dead approximately 70 feet from the point of impact. There was no evidence that Chambers attempted to slow down or avoid the roadblock.[1]

A grand jury returned a four-count indictment against Chambers, charging him with: first-degree murder of a peace offi-

---

1. At trial, a fellow inmate testified that Chambers bragged about the death of the deputy, admitting that he saw the roadblock and intended to go through it, that "if the cop wanted to be a hero he would die a hero," and that he made eye contact with the squad car occupant and saw the occupant cover his face.

cer, Minn.Stat. § 609.185(a)(4) (2012); second-degree felony murder, Minn.Stat. § 609.19, subd. 2(1) (2012); fleeing a police officer resulting in death, Minn.Stat. § 609.487, subd. 4(a) (2012); and theft of a motor vehicle, Minn.Stat. § 609.52, subd. 2(17) (2012). Because Chambers was alleged to have committed first-degree murder when he was over the age of 16, he was automatically certified to stand trial as an adult. *See* Minn.Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2 (2012). After a jury trial that spanned nearly three weeks, the jury found Chambers guilty of all four charges. The district court convicted Chambers of the first-degree murder count and sentenced him to the statutorily mandated sentence of life imprisonment without the possibility of release under Minn.Stat. § 609.106, subd. 2(1) (2012).

On direct appeal, Chambers argued, among other things, that the sentence of life imprisonment without the possibility of release imposed upon him violated the prohibition against cruel or unusual punishment under the United States and Minnesota Constitutions. *State v. Chambers* (*Chambers I*), 589 N.W.2d 466, 479 (Minn. 1999); *see* U.S. Const. amend. VIII (prohibiting cruel and unusual punishment); Minn. Const. art. I, § 5 (prohibiting cruel or unusual punishment). Chambers did not argue that a life sentence without the possibility of release was disproportional to the crime of first-degree murder of a peace officer. Consequently, we focused on whether the punishment comported with evolving standards of decency to determine whether the sentence was cruel or unusual. *Chambers I*, 589 N.W.2d at 480. To make that determination, we looked to the standards expressed by the Legislature, noting that the Legislature is "constituted to respond to the will and consequently the moral values of the people." *Id.* (internal quotation marks omitted).

We concluded that recent amendments to the relevant criminal statutes indicated that the Legislature intended to apply a life sentence without the possibility of release to a 17–year–old convicted of first-degree murder of a peace officer. *Id.* Based on decisions of federal courts on the question, as well as decisions from our court, we concluded that Chambers had failed to meet his heavy burden of proving that his sentence is "well nigh universally rejected," and so his sentence did not constitute cruel or unusual punishment. *Id.* We therefore affirmed Chambers' conviction and sentence on March 4, 1999. *Id.* at 481.

In 2007, Chambers filed a petition for postconviction relief alleging, among other things, that his trial counsel was ineffective. We affirmed the postconviction court's summary denial of Chambers' petition in 2009. *Chambers v. State* (*Chambers II* ), 769 N.W.2d 762, 763 (Minn.2009). Chambers subsequently filed a second petition for postconviction relief, asserting that he was entitled to relief under *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), which held that a sentence of life without the possibility of release imposed upon juvenile nonhomicide offenders constitutes cruel and unusual punishment in violation of the Eighth Amendment. The postconviction court summarily denied the second petition, concluding that *Graham* did not apply, that the petition was time barred under Minn. Stat. § 590.01, subd. 4, and that none of the exceptions to the time bar applied.

Chambers appealed the denial of his second petition for postconviction relief. While his case was pending before this court, the United States Supreme Court issued its decision in *Miller v. Alabama*, — U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which held that "the Eighth Amendment forbids a sentencing scheme

that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at ——, 132 S.Ct. at 2469. We ordered the parties to submit supplemental briefs to address the potential impact of *Miller* on Chambers' second petition for postconviction relief.

## I.

▇▇▇ Chambers first argues that the postconviction court abused its discretion when it concluded that *Graham* was not applicable, that his petition was time barred under Minn.Stat. § 590.01, subd. 4, and that none of the exceptions to the time bar apply. We review the denial of a petition for postconviction relief without a hearing for an abuse of discretion. *Riley v. State*, 819 N.W.2d 162, 167 (Minn.2012). In particular, we review the postconviction court's legal determinations de novo and its factual findings under the clearly erroneous standard. *Id.*

Initially, we must determine whether Chambers' second petition was untimely under Minn.Stat. § 590.01, subd. 4(a). When direct appellate review is not available, a person convicted of a crime who claims that his conviction was obtained in violation of the constitution or other law may file a petition to secure relief from the conviction and sentence, or other appropriate relief. Minn.Stat. § 590.01, subd. 1(1) (2012). Generally, a petition for postconviction relief is untimely if it is not brought within two years of either the entry of judgment of conviction or the appellate court disposition of the petitioner's direct appeal, whichever is later. *Id.*, subd. 4(a)(1)–(2). Chambers' conviction and sentence were affirmed on direct appeal on March 4, 1999. Chambers' second petition was filed on May 13, 2011, well after the time period to file a postconviction petition had lapsed.

Chambers argues that his petition may be heard despite its untimeliness because he asserts a new interpretation of federal constitutional law by the Supreme Court in *Graham* that is retroactively applicable to his case. Section 590.01, subdivision 4(b)(3) provides, in relevant part, that a court may hear a time-barred petition for postconviction relief if the petitioner asserts a new interpretation of federal law by the United States Supreme Court and the petition establishes that the new interpretation is retroactively applicable to his case.

The United States Constitution prohibits cruel and unusual punishment. U.S. Const. amend. VIII. In *Graham v. Florida*, the Supreme Court considered whether a life without parole sentence given to a juvenile nonhomicide offender constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. 560 U.S. 48, ——, 130 S.Ct. 2011, 2023–30, 176 L.Ed.2d 825 (2010). As a 16–year–old, Graham was charged with armed burglary and attempted armed robbery after he participated in a failed robbery of a restaurant, in which one of Graham's accomplices hit the manager with a metal bar. *Id.* at ——, 130 S.Ct. at 2018. No money was taken and the injured manager only required stitches in his head. *Id.* at ——, 130 S.Ct. at 2018. After violating his initial probationary sentence, Graham was sentenced to life imprisonment, the maximum sentence allowed by law and a higher sentence than either the corrections department or the prosecution had requested. *Id.* at ——, 130 S.Ct. at 2019–20. Florida abolished its parole system in 2003, leaving Graham with no possibility of release other than executive clemency. *Id.* at ——, 130 S.Ct. at 2020.

▇▇ The Court explained in *Graham* that proportionality is the touchstone of

Eighth Amendment jurisprudence. *Id.* at —, 130 S.Ct. at 2021. There are two categories of cases addressing the proportionality of criminal sentences. *Id.* at —, 130 S.Ct. at 2021. The first "involves challenges to the length of term-of-years sentences," which requires the Court to "consider[ ] all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Id.* at —, 130 S.Ct. at 2021. In the second category of proportionality cases, "the Court implements the proportionality standard by certain categorical restrictions on the death penalty." *Id.* at —, 130 S.Ct. at 2021. In the "categorical restriction[ ]" cases, the Court has developed Eighth Amendment standards using bright-line rules. *See id.* at —, 130 S.Ct. at 2021–22. Before *Graham,* every categorical restriction developed by the Court had dealt with the death penalty. *See Kennedy v. Louisiana,* 554 U.S. 407, 421, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (categorically prohibiting the death penalty for "one who raped but did not kill a child, and who did not intend to assist another in killing the child"); *Roper v. Simmons,* 543 U.S. 551, 567, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (categorically prohibiting the death penalty for defendants who committed their crimes before the age of 18); *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (categorically prohibiting the death penalty for defendants whose intellectual functioning is in a low range).

The Court noted that *Graham* was a case of a new kind: "a categorical challenge to a term of years sentence." 560 U.S. at —, 130 S.Ct. at 2022. The Court reasoned that *Graham* was different from challenges to the proportionality of term-of-years sentences because the "sentencing practice itself [was] in question." *Id.* at —, 130 S.Ct. at 2022. Because Graham's challenge "implicate[d] a particular type of sentence as it applies to an entire

class of offenders who have committed a range of crimes," the Court's typical term-of-years proportionality analysis was deemed inapplicable. *Id.* at —, 130 S.Ct. at 2022–23. Instead, for the first time, the Court used the categorical analysis in a non-death penalty case.

■ Under the categorical approach, the Court first looked to whether a national consensus existed on life imprisonment without parole sentences for juvenile nonhomicide offenders. *Id.* at —, 130 S.Ct. at 2023–26. After examining actual sentencing practices, the Court concluded that such sentences are rare—"as rare as other sentencing practices found to be cruel and unusual." *Id.* at —, 130 S.Ct. at 2025. The Court then considered "the culpability of the offenders at issue in light of their crimes and characteristics, ... the severity of the punishment in question," and whether the challenged sentencing practice served legitimate penological goals. *Id.* at —, 130 S.Ct. at 2026. Considering the offenders at issue—juveniles—the Court explained that juveniles have "lessened culpability," a "lack of maturity and an underdeveloped sense of responsibility," and thus are less deserving of the most severe punishments. *Id.* at —, 130 S.Ct. at 2026 (citation omitted) (internal quotation marks omitted).

The Court went on to discuss the crimes at issue, nonhomicide crimes, and stated that these crimes "differ from homicide crimes in a moral sense" and are "less deserving of the most serious forms of punishment." *Id.* at —, 130 S.Ct. at 2027. The Court next discussed the severity of the punishment, life imprisonment without parole, and held that it is the "second most severe penalty permitted by law" and that it "deprives the convict of the most basic liberties without giving hope of restoration." *Id.* at —, 130

S.Ct. at 2027 (citation omitted) (internal quotation marks omitted). This calculus led the Court to conclude that "[l]ife without parole is an especially harsh punishment for a juvenile." *Id.* at ——, 130 S.Ct. at 2028. The Court also observed that none of the legitimate penological goals—retribution, deterrence, incapacitation, and rehabilitation—provided an adequate justification for the sentencing practice. *Id.* at ——, 130 S.Ct. at 2028–30.

■ Based on the lack of a supporting penological theory, the limited culpability of juvenile nonhomicide offenders, and the severity of a life without parole sentence, the Court held that the practice of sentencing juvenile nonhomicide offenders to life imprisonment without the possibility of parole is cruel and unusual punishment under the United States Constitution and thus prohibited by the Eighth Amendment. *Id.* at ——, 130 S.Ct. at 2030. The Court said: "This clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." *Id.* at ——, 130 S.Ct. at 2030. The Court held that states must allow a juvenile nonhomicide offender a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at ——, 130 S.Ct. at 2030. Thus, the Court left room for the possibility that a state could incarcerate a juvenile nonhomicide offender for the remainder of the offender's life but prohibited the state from mandating such a sentence at the outset.

■ *Graham* also expressed concern for juvenile offenders tried in the adult criminal justice system, stating that "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.*

at ——, 130 S.Ct. at 2031. While the Court was cognizant of the differences between juvenile and adult offenders, it also clearly distinguished nonhomicide offenses from homicide offenses. For example, the Court stated that "[t]he instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense." *Id.* at ——, 130 S.Ct. at 2023. Further, the Court carefully distinguished the two classes of crimes. The Court stated "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at ——, 130 S.Ct. at 2027. The Court thus drew a line between homicide and nonhomicide offenses, in terms of moral depravity and the injury to the victim and the public. *Id.* at ——, 130 S.Ct. at 2027.

In his second petition for postconviction relief, Chambers acknowledged that, unlike the defendant in *Graham*, he was a juvenile *homicide* offender. Nevertheless, he claimed the principles underlying *Graham* applied with equal force to juvenile *homicide* offenders. Concluding that the United States Supreme Court had expressly limited its holding in *Graham* to juvenile *nonhomicide* offenders, the postconviction court denied Chambers' *Graham*-based claim without an evidentiary hearing because there were no material facts in dispute and the State was entitled to dismissal as a matter of law.

We conclude that the Court's holding in *Graham* does not apply to juvenile homicide offenders like Chambers. *Graham* held that life imprisonment without parole sentences are unconstitutionally cruel and unusual as applied to juvenile nonhomicide offenders only and explained that homicides are treated differently under the Eighth Amendment. *See Graham*, 560 U.S. at ——, 130 S.Ct. at 2023 ("The in-

stant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense."); *id.* at ——, 130 S.Ct. at 2027 ("The Court has recognized that defendants who do not kill ... are categorically less deserving of the most serious forms of punishments than are murderers."). It is true that *Graham* represents a new approach by the Supreme Court—for the first time setting a categorical ban on certain types of punishment in a non-capital case. But the Court's categorical approach resulted in a bright-line rule only for nonhomicide offenders. Because Chambers' underlying offense was a homicide, the *Graham* rule does not apply to him.

Consequently, Chambers' *Graham*-based claim fails to satisfy the new interpretation of federal or state law exception in section 590.01, subdivision 4(b)(3). Accordingly, we hold that the postconviction court did not abuse its discretion when it summarily denied the claim.

## II.

■ During the pendency of Chambers' appeal, the Supreme Court decided *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which held that the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at ——, 132 S.Ct. at 2469. We ordered the parties to submit supplemental briefs to address the poten-

tial impact of *Miller* on Chambers' second petition for postconviction relief. In his supplemental brief, Chambers seeks the benefit of the rule in *Miller*. Specifically, he contends that *Miller* applies retroactively to his sentence, and therefore he satisfies the time-bar exception of Minn. Stat. § 590.01, subd. 4(b)(3).[2] The State responds that *Miller* does not apply retroactively to Chambers' sentence, and therefore *Miller* does not impact the claim for relief asserted in Chambers' second petition for postconviction relief. We begin our analysis with a discussion of the Court's decision in *Miller* and then consider whether the rule announced in *Miller* applies to Chambers.

### A.

In *Miller*, the Supreme Court considered whether the imposition of a mandatory life sentence without the possibility of release for those under the age of 18 at the time of their crimes violated the Eighth Amendment's prohibition against cruel and unusual punishment. —— U.S. at ——, 132 S.Ct. at 2460. The case involved the consolidated appeals of two 14–year–olds convicted of homicide.[3] *Id.* In both cases, the offenders were tried as adults and sentenced to life imprisonment without parole. *Id.* at ——, 132 S.Ct. at 2461–63. In both cases (one from Alabama, one from Arkansas), the sentence imposed was mandatory under state law, and the sentencing

---

**2.** Chambers requested in his supplemental brief that "these proceedings be remanded back to the Rice [County] District Court for further proceedings" because *Miller* "raises both legal and factual issues that are best addressed in the first instance by the postconviction court." But at oral argument, Chambers' counsel asked us to address the legal issue of whether *Miller* applies retroactively to Chambers, acknowledging that Chambers' position on the remand issue had changed after he filed his supplemental brief.

**3.** The two cases were *Jackson v. Hobbs* and *Miller v. Alabama*. The *Jackson* case was before the Court on a writ of certiorari from a decision of the Arkansas Supreme Court that affirmed the dismissal of Jackson's state petition for habeas corpus. *Miller*, —— U.S. at ——, 132 S.Ct. at 2461, 2463. In *Miller*, the Court granted certiorari to review a decision by the Alabama Court of Criminal Appeals that affirmed Miller's conviction and sentence on direct appeal. *Id.* at ——, 132 S.Ct. at 2462–63.

courts had no discretion to consider the individual characteristics of the offenders or their crimes in imposing the sentences. *Id.* at ——, 132 S.Ct. at 2461–63. The Court concluded that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at ——, 132 S.Ct. at 2469.

█ The Supreme Court reached that conclusion by applying two lines of precedent. *Id.* at ——, 132 S.Ct. at 2463–64, 2469. First, the Court considered previous cases announcing categorical bans on sentencing practices as they apply to juveniles, particularly *Graham v. Florida*, 560 U.S. ——, 130 S.Ct. 2011, and *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183. *Miller,* —— U.S. at ——, 132 S.Ct. at 2464–66. The Court noted that *Graham* and *Roper* "establish that children are constitutionally different from adults for purposes of sentencing." *Id.* at ——, 132 S.Ct. at 2464. For instance, the Court explained that compared to adults, children lack maturity and a sense of responsibility, are more vulnerable to outside influences, and have yet to fully develop their character. *Id.* at ——, 132 S.Ct. at 2464. The Court observed that children have "diminished culpability and greater prospects for reform." *Id.* at ——, 132 S.Ct. at 2464. The Court then took the reasoning in *Graham* one step further and said:

> [N]one of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. . . . So *Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses. . . . *Graham* insists that youth matters in determining the appropriate-

ness of a lifetime of incarceration without the possibility of parole.

*Id.* at ——, 132 S.Ct. at 2465. Thus, the Court concluded that imposition of life without the possibility of parole sentences on juvenile offenders "cannot proceed as though they were not children." *Id.* at ——, 132 S.Ct. at 2466.

█ Second, the Court applied its jurisprudence requiring individualized decision-making in capital punishment cases, because the Court reasoned that a life without parole sentence for a juvenile is tantamount to a death sentence. *Id.* at ——, 132 S.Ct. at 2466–68. The Court expressed concern that "mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age." *Id.* at ——, 132 S.Ct. at 2467. Because "[m]andatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features," the Court concluded that a sentencing scheme that mandates a life without the possibility of parole sentence for juvenile homicide offenders is unconstitutional. *Id.* at ——, 132 S.Ct. at 2468–69.

█ The Supreme Court was careful to clarify that its holding in *Miller* was not a categorical prohibition on the punishment, but instead a requirement that the judge or jury consider the individual characteristics of the juvenile offender before imposing a life without the possibility of parole sentence. *Id.* at ——, 132 S.Ct. at 2471. The Court did "not foreclose a sentencer's ability to [impose a life without parole sentence on a juvenile] in homicide cases," but instead required "only that a sentencer follow *a certain process*—considering an offender's youth and attendant characteristics—before imposing" a sentence of life imprisonment without the possibility of parole. *Id.* at ——, 132 S.Ct. at 2469, 2471 (emphasis added).[4]

## B.

■ In this case, Chambers was sentenced to life imprisonment without the possibility of release under a mandatory sentencing scheme that allowed no discretion or consideration of Chambers' age or the unique characteristics of his background or his offense. *Chambers I*, 589 N.W.2d at 473. Consequently, we must determine whether Chambers is entitled to the benefit of the rule announced in *Miller*.[5]

■ In *Teague v. Lane*, the United States Supreme Court clarified when a defendant is entitled to the benefit of a new rule. 489 U.S. 288, 300–10, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Court concluded that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Id.* at 305, 109 S.Ct. 1060 (citation omitted) (internal quotation marks omitted). But once a conviction or sentence becomes final, the defendant is not entitled to the retroactive benefit of a new rule, subject to two exceptions. *Id.* at 307, 109 S.Ct. 1060.

First, "a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Id.* (citation omitted) (internal quotation marks omitted). Second, "a new rule should be applied retroactively if it requires the observance of those procedures that are . . . implicit in the concept of ordered liberty." *Id.* (citation omitted) (internal quotation marks omitted). The second exception is "reserved for watershed rules of criminal procedure." *Id.* at 311, 109 S.Ct. 1060. The Court rested its general rule of nonretroactivity to cases pending on collateral review on comity and finality considerations. *Danforth v. Minnesota* (*Danforth II* ), 552 U.S. 264, 279, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), *rev'g Danforth v. State* (*Danforth I* ), 718 N.W.2d 451 (Minn.2006). Notably in *Teague*, the Court stated: "Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." 489 U.S. at 309, 109 S.Ct. 1060.

---

4. The dissent of Justice Page (Page dissent) contends that *Miller* demonstrates "we got it wrong" in *Chambers I*. We disagree. In *Chambers I*, we did not consider the claim that a sentence of life imprisonment without the possibility of release for juvenile homicide offenders was unconstitutional because it was mandatory; instead, we considered, and rejected, the claim that the sentence was categorically unconstitutional, regardless of its mandatory nature. 589 N.W.2d at 480 ("The real issue before us today is not whether a sentence of life imprisonment without possibility of release for a first-degree murder of a peace officer is constitutional, but whether persons under 18 are thought to be specially exempt from it." (citation omitted) (internal quotation marks omitted)). In *Miller*, the Supreme Court similarly rejected the claim that a life sentence without release for juveniles was categorically unconstitutional. —— U.S.

at ——, 132 S.Ct. at 2471. Indeed, the Court in *Miller* expressly stated that it did "not foreclose a sentencer's ability" to impose that sentence. *Id.* at ——, 132 S.Ct. at 2469. Thus, our decision in *Chambers I* is consistent with *Miller*.

5. The dissent of Justice Paul Anderson (Anderson dissent) attempts to reframe the issue as whether the court should allow an "unconstitutional sentence of life without the possibility of release to remain in place in Minnesota." The Anderson dissent is wrong. The precise issue before us is whether Chambers, whose conviction of first-degree murder for killing a police officer in the line of duty was final 14 years ago, is entitled to the retroactive effect of a new decision of the United States Supreme Court.

We have reaffirmed that Minnesota follows the retroactivity principles outlined in *Teague* when considering whether a rule of federal constitutional law applies to a criminal conviction that was final when the rule was announced. *Danforth v. State (Danforth III )*, 761 N.W.2d 493, 499–500 (Minn. 2009). In *Danforth III*, we expressly rejected the argument that Minnesota should return to the *Linkletter–Stovall* balancing test, under which a court considers the purpose of the new rule, any reliance on the prior rule, and the effect on the administration of justice of granting retroactive effect. *Id.* at 495–96, 499.

Although the *Teague* retroactivity doctrine necessarily denies certain defendants the benefit of new rules of criminal procedure, we have consistently recognized the need to safeguard the important principles underlying the doctrine, including finality and providing a bright-line rule for when relief is to be retroactive.[6] Recently, we have applied the *Teague* retroactivity principles in three cases. *See Campos v. State*, 816 N.W.2d 480 (Minn.2012); *Danforth III*, 761 N.W.2d 493; *State v. Houston*, 702 N.W.2d 268 (Minn.2005).

In *Houston*, we rejected the defendant's claim on collateral review that he was entitled to the retroactive benefit of the new rule announced by the Supreme Court in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which held that "the maximum punishment for *Apprendi* purposes is the maximum sentence the judge may impose based solely upon those facts either reflected in the jury verdict or admitted by the defendant." 702 N.W.2d at 271; *see also id.* at 274. Based on our holding in *Houston*, defendants on collateral review, who received punishments that exceeded the presumptive guideline sentence based on a sentencing process that was declared unconstitutional in *Blakely*, were not entitled to resentencing in accordance with the new requirements announced in *Blakely*.

In *Danforth III*, we reaffirmed the *Teague* analysis as a matter of state law and rejected the defendant's claim that he was entitled to the retroactive application of the new rule announced by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that defendants have a right under the Sixth Amendment to cross-examine witnesses who have made testimonial statements. 761 N.W.2d at 495. In *Crawford*, the Court emphasized that test-

---

**6.** The Page dissent urges that we adopt a new exception to the *Teague* retroactivity doctrine because Chambers challenged the constitutionality of his sentence on direct appeal, and therefore he should receive special consideration. We disagree for three reasons. First, it is undisputed that Chambers' life sentence was constitutional at the time it was imposed. *Chambers I*, 589 N.W.2d at 480 (concluding that a mandatory life sentence without the possibility of release for juvenile homicide offenders is constitutional). Second, we have expressly rejected the *Linkletter–Stovall* balancing test in favor of the *Teague* retroactivity doctrine because it "provides a bright line rule on the issue of when relief is to be retroactive." *Danforth III*, 761 N.W.2d at 499. Third, the *Teague* doctrine safeguards important principles of finality. We conclude that the dissent has not presented a compelling reason for us to depart from the *Teague* doctrine in this case. Indeed, the reasons underlying the *Teague* doctrine provide strong support for its application here.

The Anderson dissent argues that retroactive application of the *Miller* rule will not adversely affect the administration of justice because "a remand will allow the postconviction court to reconsider Chambers's sentence." *Infra* at D–4. For the same reasons expressed above, this argument lacks merit. Further, an argument that the degree of retroactivity afforded a new rule should depend on "the particular rule under consideration" is no more persuasive today than it was in *Danforth III*, 761 N.W.2d at 502 (Anderson, Paul, J. dissenting) (citation omitted) (internal quotation marks omitted).

ing in "the crucible of cross-examination" was constitutionally required to ensure the reliability of evidence. 541 U.S. at 61, 124 S.Ct. 1354. Based on our holding in *Danforth III*, defendants on collateral review, whose trials included testimonial statements that were not subjected to the crucible of cross-examination, were not entitled to new trials conducted in accordance with the requirements announced in *Crawford*.

Finally, in *Campos* we applied *Teague* and rejected the defendant's argument that he was entitled to the retroactive benefit of a new rule announced by the Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), which held that the Sixth Amendment right to counsel requires counsel to give correct advice to his or her client when the deportation consequences of a guilty plea are clear. 816 N.W.2d at 487 n. 5, 497–99. Based on our holding in *Campos*, defendants on collateral review, whose counsel failed to give them correct advice on the deportation consequences of their guilty pleas, were not entitled to new plea hearings conducted in accordance with the requirements announced in *Padilla*.

In *Houston*, *Danforth III*, and *Campos*, we applied *Teague* and concluded that the defendant was not entitled to the retroactive benefit of a new rule announced by the Supreme Court. Our analysis in those cases denied certain defendants the benefit of new rules of criminal procedure, but safeguarded the important principles underlying the *Teague* retroactivity doctrine,

particularly finality and providing a bright-line rule for when relief is to be retroactive. For the same reasons, we apply the *Teague* doctrine to this case.[7]

▮▮▮▮ The first question under the *Teague* doctrine is whether *Miller* announced a "new rule." *Campos*, 816 N.W.2d at 488. A Supreme Court decision "constitutes a new rule within the meaning of *Teague* if it breaks new ground, imposes a new obligation on the States or the Federal Government, or was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 489 (citation omitted) (internal quotation marks omitted). Under the *Teague* doctrine, a "new rule" generally does not apply to a defendant on collateral review. *Id.* at 488. This principle serves to " 'validat[e] reasonable, good-faith interpretations of existing precedents made by state courts even though they are later shown to be contrary to later decisions.' " *Houston*, 702 N.W.2d at 271 (quoting *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990)).

The parties do not dispute that *Miller* announced a new rule and that Chambers' conviction and sentence were final at the time *Miller* was decided. Indeed, when Chambers' conviction became final in 1999, *Roper* and *Graham* had not been decided yet and *Miller* was certainly not "dictated by precedent." We acknowledge that the Court in *Miller* stated that it was "breaking no new ground in these cases." —— U.S. at ——, 132 S.Ct. at 2472. But as we emphasized in *Campos*, "[t]he mere fact

---

**7.** The Anderson dissent argues that under *Danforth II*, we are not bound to follow *Teague*. But we reaffirmed that *Teague* is the standard for Minnesota courts in *Danforth III*, 761 N.W.2d at 500. Moreover, we subsequently applied the *Teague* doctrine in *Campos*, 816 N.W.2d at 488. Essentially, the dissent invites the court to overturn our precedent adopting *Teague*. We do not overturn

our precedent without a compelling reason. *See State v. Martin*, 773 N.W.2d 89, 98 (Minn.2009) (stating that we require a "compelling reason" before a prior decision will be overturned); *State v. Lee*, 706 N.W.2d 491, 494 (Minn.2005) (explaining that we are "extremely reluctant to overrule our precedent under principles of *stare decisis*"). This is not that case.

that a court says that its decision is within the logical compass of an earlier decision, or indeed that it is controlled by a prior decision, is not conclusive for purposes of deciding whether the current decision is a new rule under *Teague*." 816 N.W.2d at 489 n. 7 (citation omitted) (internal quotation marks omitted). Because *Miller* was not "dictated by precedent" when Chambers' conviction and sentence became final in 1999, we conclude that the rule announced in *Miller* 14 years later constitutes a "new rule" under the *Teague* doctrine. Our conclusion is consistent with the analysis of courts in other jurisdictions that have addressed the same issue.[8]

## C.

Having concluded that *Miller* announced a new rule, we must next consider whether Chambers is entitled to the retroactive application of *Miller*. Since Chambers is before us on postconviction review, he must satisfy one of the two narrow exceptions under *Teague*. Chambers relies on both exceptions. We will discuss each in turn.

The first exception applies to substantive rules that alter the range of conduct or the class of persons that the law punishes. *Schriro v. Summerlin*, 542 U.S. 348, 351–52, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). In comparison, rules that "regulate only the manner of determining the defendant's culpability are procedural," and therefore not substantive. *Id.* at 353, 124 S.Ct. 2519 (emphasis omitted).

Several cases have clarified the difference between substantive and procedural rules. On the one hand, a new rule is "substantive" if the rule "*narrow[s]* the scope of a criminal statute by interpreting its terms," or "place[s] particular conduct or persons covered by the statute beyond the State's power to punish." *Schriro*, 542 U.S. at 351–52, 124 S.Ct. 2519 (emphasis added) (citations omitted). In *Penry v. Lynaugh*, the Court explained that the definition of a "substantive" rule for purposes of the first *Teague* exception was not limited to new rules that placed certain conduct completely beyond the State's power to punish. 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds, Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Instead, a substantive rule also includes new rules that place a certain class of individuals beyond the State's power to punish by death. *Id.* In other words, substantive rules "apply retroactively because they 'necessarily carry a significant risk that a defendant stands convicted of *an act that the law does not make criminal*' or faces *a punishment that the law cannot impose* upon him" because of his status or offense. *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519 (emphasis added) (quoting *Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)).

The Court in *Penry* explained that in both situations "the Constitution itself deprives the State of *the power to impose a certain penalty*, and the finality and comity concerns" underlying the retroactivity doctrine "have little force." 492 U.S.

---

8. *See, e.g., Craig v. Cain*, No. 12–30035, 2013 WL 69128, at *1 (5th Cir. Jan. 4, 2013) (holding that the rule announced in *Miller* constitutes a new rule under the *Teague* doctrine); *People v. Morfin*, 367 Ill.Dec. 282, 981 N.E.2d 1010, 1022 (Ill.App.Ct.2012) (same); *People v. Carp*, 298 Mich.App. 472, 828 N.W.2d 685,

708 (2012) (explaining that it was "uncontested that *Miller* falls within the definition of a 'new rule' because it 'was not dictated by precedent existing at the time [Carp's] conviction became final' " (citation omitted) (internal quotation marks omitted)).

at 330, 109 S.Ct. 2934 (emphasis added). More specifically, the Court wrote: "[T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id.* The Court explained that if it "held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry *regardless of the procedures followed,* such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review." *Id.* (emphasis added). Courts have uniformly held, consistent with *Penry,* that the categorical sentencing bans announced in *Graham* and *Roper* satisfy the substantive rule exception of the *Teague* doctrine. *See, e.g., In re Moss,* 703 F.3d 1301, 1303 (11th Cir.2013) (same); *In re Sparks,* 657 F.3d 258, 262 (5th Cir.2011) (holding that *Graham* announced a substantive rule under the *Teague* doctrine); *Little v. Dretke,* 407 F.Supp.2d 819, 823 (W.D.Tex.2005) (holding that *Roper* announced a substantive rule under the *Teague* doctrine); *Bonilla v. State,* 791 N.W.2d 697, 700–01 (Iowa 2010) (same); *see also* 7 Wayne R. LaFave et al., *Criminal Procedure* § 28.6(e) (3d ed. Supp.2012).

■ On the other hand, rules that "regulate only the manner of determining the defendant's culpability are procedural." *Schriro,* 542 U.S. at 353, 124 S.Ct. 2519. "They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Id.* at 352, 124 S.Ct. 2519. The definition of a procedural rule for purposes of the first *Teague* exception

extends to rules that regulate the manner of determining a defendant's sentence. *Lambrix v. Singletary,* 520 U.S. 518, 539, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). In *Lambrix,* the Court considered whether the rule announced in *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), constituted a substantive or procedural rule under the *Teague* doctrine. 520 U.S. at 526–27, 117 S.Ct. 1517. Under the *Espinosa* rule, an actor with capital sentencing authority must not be permitted to weigh invalid aggravating circumstances. 505 U.S. at 1082, 112 S.Ct. 2926. The Court in *Lambrix* held that the *Espinosa* rule was procedural, not substantive, because it "neither decriminalized a class of conduct nor prohibited the imposition of capital punishment on a particular class of persons." 520 U.S. at 539, 117 S.Ct. 1517 (quoting *Saffle v. Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)); *see also Sawyer v. Smith,* 497 U.S. 227, 241, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (holding that the rule announced in *Caldwell v. Mississippi,* 472 U.S. 320, 341, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which requires that a jury with capital sentencing authority must be made aware of the gravity of its task, was procedural).

In summary, a new rule regarding sentencing is substantive if it eliminates the power of the State to impose the punishment in question regardless of the procedures followed. *Penry,* 492 U.S. at 330, 109 S.Ct. 2934. On the other hand, the new rule is procedural if it regulates the manner in which the State exercises its continuing power to impose the punishment in question. *Lambrix,* 520 U.S. at 539, 117 S.Ct. 1517. Keeping the difference between substantive and procedural rules in mind, we consider Chambers' arguments regarding the *Teague* exceptions.

Chambers' primary argument is that the *Miller* rule satisfies the first *Teague* ex-

ception: that it is a substantive rule and therefore entitled to retroactive application. More specifically, Chambers argues that the *Miller* rule is substantive because (1) it prohibits the imposition of a mandatory sentence of life in prison without the possibility of parole "on a particular class of persons"—namely juvenile homicide offenders, and (2) it announced a new "element" by requiring consideration of potentially mitigating circumstances regarding the offender's youth and attendant characteristics.

We conclude that the rule announced in *Miller v. Alabama* is procedural, not substantive. We reach that conclusion for several reasons. First, the rule announced in *Miller* does not eliminate the power of the State to impose the punishment of life imprisonment without the possibility of release upon a juvenile offender who has committed a homicide offense.[9] Instead, *Miller* invalidated a sentencing scheme that mandated the punishment of life without the possibility of release without consideration of the unique characteristics of a juvenile offender. In particular, *Miller* re-

quires "that a sentencer follow *a certain process*—considering an offender's youth and attendant characteristics—before imposing" a sentence of life imprisonment without the possibility of parole. —— U.S. at ——, 132 S.Ct. at 2471 (emphasis added). Similar to *Schriro*, the Court in *Miller* altered the permissible methods by which the State can exercise its continuing power to punish juvenile homicide offenders by life imprisonment without the possibility of parole.[10]

Second, relevant federal decisions have concluded *Miller* is procedural, and therefore not retroactive. *See, e.g., Craig v. Cain,* No. 12–30035, 2013 WL 69128, at *1–2 (5th Cir. Jan. 4, 2013). In *Craig,* the Fifth Circuit explained:

[T]he Supreme Court has denied retroactive application of prohibitions against weighing invalid aggravating circumstances in certain circumstances, imposition of a death sentence by a jury that has been led to believe responsibility for determining the appropriateness of a

---

9. The Page dissent correctly points out that under the *Teague* retroactivity doctrine, the court must determine whether the rule announced in *Miller* is substantive or procedural. But the flaw in the dissent's analysis is that in determining retroactivity, it incorrectly focuses on the Minnesota sentencing scheme rather than the nature of the *Miller* rule. Moreover, the dissent's argument that the *Miller* rule is substantive is contradicted by its acknowledgment that if the State makes an "individualized determination" before imposing a life sentence, then "the punishment would no longer be beyond the power of the state to impose." *Infra* at D–2 n. 1. Such a sentencing rule—a rule that does not remove from the State the power to impose a particular punishment—is the quintessential procedural determination under the *Teague* retroactivity doctrine.

10. The Anderson dissent relies on *Schriro* to argue that the rule announced in *Miller* is substantive. *Schriro,* however, does not sup-

port the dissent's argument. Indeed, *Schriro* states that substantive rules are those which place particular conduct or persons covered by the statute beyond the state's power to punish. 542 U.S. at 352, 124 S.Ct. 2519. As to this category the Court said "[s]uch rules apply retroactively because they necessarily carry a significant risk that a defendant ... faces a punishment that the law cannot impose." *Id.* (citation omitted) (internal quotation marks omitted). It is undisputed that neither situation exists in this case—first-degree murder of a police officer in the line of duty remains criminal, and a state is not prohibited from imposing a life sentence without the possibility of release upon a juvenile offender provided the proper procedure is followed. The dissent attempts to avoid this problem by arguing that *Miller* adds a new element to sentencing. The dissent is wrong—*Miller* simply imposes a new procedure in which the sentencing judge must consider the youthfulness of the offender.

death sentence rests elsewhere, and capital-sentencing schemes that foreclose a jury from considering all mitigating evidence.

*Craig*, 2013 WL 69128 *2 (citing *Beard v. Banks*, 542 U.S. 406, 417, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004); *Lambrix*, 520 U.S. at 539, 117 S.Ct. 1517; *Sawyer*, 497 U.S. at 241, 110 S.Ct. 2822; and *Saffle*, 494 U.S. at 495, 110 S.Ct. 1257). The Fifth Circuit held that "*Miller* does not satisfy the [first *Teague* exception] because it does not categorically bar all sentences of life imprisonment for juveniles; *Miller* bars only those sentences made mandatory by a sentencing scheme." *Id.* Like the Fifth Circuit, we conclude that the *Miller* rule is similar to the rules at issue in *Lambrix* and *Sawyer* because the *Miller* rule does not deprive the State of *the power* to punish a juvenile homicide offender with life imprisonment without the possibility of parole, but instead only prohibits a specific sentencing method, procedure, or scheme—namely, mandatory sentencing statutes.

Third, despite Chambers' assertion to the contrary, the *Miller* rule does not announce a new "element." Unlike the Arizona statute at issue in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the *Miller* rule does not mandate that a certain aggravating factor be proven before the State imposes the sentence in question. In *Ring*, the statute at issue provided that a "death sentence may not legally be imposed ... unless at least one aggravating factor is found to exist beyond a reasonable doubt." 536 U.S. at 597, 122 S.Ct. 2428 (citation omitted) (internal quotation marks omitted). The *Ring* Court held that "[b]ecause Arizona's enumerated aggravating factors operate as the 'functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury."

*Id.* at 609, 122 S.Ct. 2428 (citations omitted).

In *Schriro*, the Court rejected the defendant's argument that the rule announced in *Ring* was substantive under the first *Teague* exception because it "modified the elements of the offense for which he was convicted." 542 U.S. at 354, 124 S.Ct. 2519. The Court explained that "*because Arizona* has made a certain fact essential to the death penalty, that fact must be found by a jury, [but that] is not the same as *this Court's* making a certain fact essential to the death penalty. The former was a procedural holding; the latter would be substantive." *Id.* By requiring a sentencer to consider the potentially mitigating circumstances of an offender's youth and attendant characteristics, the *Miller* rule does not create a requirement that is the "functional equivalent of an element." *See Ring*, 536 U.S. at 609, 122 S.Ct. 2428 (citations omitted) (internal quotation marks omitted). This is especially true when the *Miller* rule does not require the sentencer to make any *specific finding of fact* and when the Supreme Court has recognized the distinction "between facts in aggravation of punishment and facts in mitigation." *Apprendi v. New Jersey*, 530 U.S. 466, 490 n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Miller* does not announce a new element because it does not require the State to prove any specific fact before the sentencer imposes the punishment of life imprisonment without the possibility of release on a juvenile homicide offender.

In summary, we conclude that the rule announced in *Miller* is procedural, not substantive, for three reasons. First, the *Miller* rule does not eliminate the power of the State to impose the punishment of life imprisonment without the possibility of release upon a juvenile offender who has committed a homicide offense. Second, our analysis is consistent with relevant

federal decisions. Third, the *Miller* rule did not announce a new element.

### D.

 Having concluded that the *Miller* rule is procedural, we next consider Chambers' alternative argument that, even if we conclude that the *Miller* rule is procedural, he is still entitled to retroactive application of the rule because it is a watershed rule and therefore satisfies the second *Teague* exception. In order to qualify as a watershed rule, a "new rule must both be 'necessary to prevent an impermissibly large risk of an inaccurate conviction' and 'alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.'" *Campos,* 816 N.W.2d at 498 (quoting *Whorton v. Bockting,* 549 U.S. 406, 418, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007)). But as we recognized in *Campos,* "[t]he [Supreme] Court has repeatedly emphasized that the watershed 'exception is extremely narrow,' and since its decision in *Teague* has 'rejected every claim that a new rule satisfied the requirements for watershed status.'" *Campos,* 816 N.W.2d at 497 (quoting *Whorton,* 549 U.S. at 417–18, 127 S.Ct. 1173). In fact, the Court has indicated that "it is unlikely that any" watershed rules have "'yet to emerge.'" *Schriro,* 542 U.S. at 352, 124 S.Ct. 2519 (quoting *Tyler v. Cain,* 533 U.S. 656, 667 n. 7, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001)). "To come within the watershed exception, the rule must institute procedures implicit in the concept of ordered liberty, . . . and it is not enough that a new rule is aimed at improving the accuracy of trial, or even that it promotes [t]he objectives of fairness and accuracy." *Campos,* 816 N.W.2d at 498 (citations omitted) (internal quotation marks omitted). The only case that has ever satisfied this high threshold is *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), in which the Court

"'held that counsel must be appointed for any indigent defendant charged with a felony.'" *Campos,* 816 N.W.2d at 498 (quoting *Whorton,* 549 U.S. at 419, 127 S.Ct. 1173).

 We conclude that *Miller* is not a watershed rule for two reasons. First, *Miller* deals exclusively with sentencing and does not "impact the accuracy of an underlying determination of guilt or innocence." *Houston,* 702 N.W.2d at 273. Moreover, *Miller*'s holding, "unlike the expansive rule in *Gideon* establishing a right to counsel in all felony cases, affects only a small subset of defendants, indicating that the rule does not have a fundamental and profound impact on criminal proceedings generally." *Campos,* 816 N.W.2d at 499. Second, the *Miller* Court's review of its precedents demonstrates that its holding was not a "watershed" development. The Court's cases have long established that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual." *Abdul–Kabir v. Quarterman,* 550 U.S. 233, 246, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) (citing *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)) (holding that the imposition of mandatory death sentence without consideration of the character and record of the individual offender or the circumstances of the particular offense was inconsistent with the fundamental respect for humanity that underlies the Eighth Amendment); *Penry,* 492 U.S. at 328, 109 S.Ct. 2934 ("In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' . . . the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." (citation omit-

ted); *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ("[T]he sentencer in capital cases must be permitted to consider any relevant mitigating factor."); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) ("[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.")). *Miller's* extension of this well-established principle to non-capital sentencing does not rise to the level of a rule like *Gideon* that "'alter[s] our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding.'" *Whorton,* 549 U.S. at 420, 127 S.Ct. 1173 (emphasis added) (quoting *Tyler,* 533 U.S. at 665, 121 S.Ct. 2478).

Consequently, the rule announced in *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), is a new rule of criminal constitutional procedure that is neither substantive nor a watershed rule that alters our understanding of the bedrock procedural elements essential to the fairness of a proceeding. Therefore, Chambers is not entitled to the retroactive benefit of the *Miller* rule in a postconviction proceeding.

### III.

■ Accordingly, we conclude that the postconviction court did not abuse its discretion when it denied Chambers' postconviction petition without a hearing because the petition was untimely under Minn.Stat. § 590.01, subd. 4(a), and none of the exceptions in section 590.01, subdivision 4(b), apply.

Affirmed.

ANDERSON, G. BARRY, Justice (concurring).

I join the majority opinion because I agree with the majority's analysis that under existing precedent the rule in *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), does not apply retroactively to cases on collateral review. I write separately to observe that any modification of the existing precedent should be left to the United States Supreme Court, whether here or in some other case, because the Court has determined the constitutional limits that underlie *Miller,* and it is United States Supreme Court jurisprudence at issue in the matter before us. The parties here did not brief other potential avenues for relief under Minnesota law, so contrary to the dissent, I would not reach those questions. I believe such issues are better left for another day, with a better record, and perhaps a clearer explanation of retroactivity doctrine by the United States Supreme Court.

WRIGHT, Justice (concurring).

I join in the concurrence of Justice G. Barry Anderson.

ANDERSON, Justice PAUL H. (dissenting).

Prediction is very difficult, especially about the future.

*Niels Bohr*
*Danish Physicist*

I respectfully dissent. I am loathe to join an opinion of our court that permits an unconstitutional sentence of life in prison without the possibility of release to

remain in place in Minnesota. My obligation and duty to dissent is heightened by the knowledge that the United States Supreme Court has "likened life without parole for juveniles to the death penalty itself." *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407 (2012) (citing *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)). The Supreme Court has apprised us of the fact that appellant Timothy Patrick Chambers's sentence of life in prison without the possibility of release is tantamount to a death sentence. *See id.* at 2463, 2466. We must not only listen to, but we must respond appropriately to the message the Supreme Court has sent to us. Unfortunately, with the decision rendered by the majority today, we have failed to do so.

Indisputably, Chambers's prison sentence of life without the possibility of release was imposed under a Minnesota statute that the United States Supreme Court has rendered unconstitutional when that statute's mandatory without-possibility-of-release provision is applied to a juvenile offender. *See* Minn.Stat. § 609.106, subd. 2(1) (2012). In its recent decision, *Miller v. Alabama,* the Supreme Court held that any sentence imposed on a juvenile under a statute such as section 609.106, subdivision 2(1), violates the "cruel and unusual" punishment clause of the Eighth Amendment of the United States Constitution. *Miller,* —— U.S. at ——, 132 S.Ct. at 2475. I conclude that the majority's holding, which allows Chambers's sentence to remain in place, is not only wrong, but the opinion is arrantly objectionable because it leaves Chambers's sentence forever unexamined under the rule articulated in *Miller.*

The majority's opinion is remarkable and erroneous for several reasons. First, as previously noted, the Supreme Court has held that Chambers's sentence is tantamount to a death sentence for an offender who, like Chambers, is sentenced for a crime committed when he was a juvenile. *Miller,* —— U.S. at ——, 132 S.Ct. at 2466–67. This holding standing alone is more than sufficient reason to distinguish today's case from those the majority relies on to support its decision. Therefore, I would conclude that the Supreme Court's holding provides a sufficient basis upon which to grant a remand to the postconviction court to reassess Chambers's sentence in the context of the constitutional mandate articulated in *Miller.* Second, despite what the majority asserts, there are at least three viable, well-grounded, and principled legal routes available to us so that we can avoid the result reached by the majority today. The need to refute the majority's analysis is heightened by my knowledge that there are multiple routes available to order a remand. Finally, the need to dissent is magnified by the fact that the majority either chooses to ignore or fears to fully recognize the viability of any of the alternative routes.

The majority has decided—for reasons that I find unpersuasive—to dismiss the opportunity to reach a different result by failing to take any of these viable alternate analytical routes. More specifically, the majority, demonstrating what I consider to be an overabundance of caution, rejects the first route of analysis—a *Teague* substantive-rule retroactive application analysis. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). The majority does so on the grounds that the substantive-rule route is too narrow and/or too risky to take given how difficult it is to interpret and construe United States Supreme Court jurisprudence, and to predict what the Court will do in a future case. The majority rejects the second route outright—a route designed and delivered to us by the Supreme Court itself in *Danforth v. Minnesota (Danforth II),* 552 U.S. 264, 128 S.Ct. 1029,

169 L.Ed.2d 859 (2008), *rev'g Danforth v. State (Danforth I)*, 718 N.W.2d 451 (Minn. 2006). In *Danforth*, the Court told us that, as a state court, we are not tethered to its analysis in *Teague.* The court stated that, "[t]he question in this case is whether *Teague* constrains the authority of state courts to give broader effect to new rules of criminal procedure than is required by [*Teague*]. We have never suggested that it does, and now hold that it does not." *Id.* at 266, 128 S.Ct. 1029. When the majority rejects this second route it not only chooses to keep our court tethered to a self-imposed legal barrier, but in the process builds upon that barrier. Unfortunately, this self-imposed, supposititious [1] barrier can and does thwart reasonable efforts by Minnesota citizens to seek justice under the law. *See generally Danforth v. State (Danforth III)*, 761 N.W.2d 493, 500–02 (Minn.2009) (Anderson, Paul H., J., dissenting). The third alternate route is to grant relief under our power to act in the interests of justice. While this third route is and should be the least accessible of the alternate routes, it is still available; yet the majority ignores it completely.

I cannot understand, much less appreciate, why the majority is so drawn to the continued imposition of a cruel and unusual punishment. The majority consciously avoids the clear and principled lines of legal analysis available to it to remand this case to the postconviction court. The postconviction court should be allowed to fix the constitutionally defective portion of Chamber's sentence—its mandatory nature—and to resentence Chambers in accordance with his constitutional rights as articulated by the Supreme Court in *Miller*.

Instead of allowing Chambers's sentence to be made compliant with *Miller*, the majority chooses an analytical route that leads to the harsh result announced today. That result mandates the continued imposition of Chambers's constitutionally impermissible sentence. The majority's course of action is especially puzzling given that a remand to the postconviction court does not in and of itself change the life-in-prison-without-release aspect of Chambers's sentence. A remand merely allows a correction of the unconstitutional mandatory nature of Chambers's sentence. In essence, a remand will allow the postconviction court to reconsider Chambers's sentence under criteria that fit within the ambit of the United States Constitution.

For all of these reasons I must reject the majority's analysis and dissent from its holding. I will now proceed to explain in more detail the reasons and legal analysis that mandate my rejection of the majority's opinion.

I.

Rightly or wrongly, as the majority articulates, our court has adopted the principles that the Supreme Court outlined in *Teague v. Lane* to determine whether a rule of federal constitutional law applies in a collateral appeal. *See Teague*, 489 U.S. 288, 109 S.Ct. 1060 (plurality opinion); *see also Campos v. State*, 816 N.W.2d 480, 489–90 (Minn.2012) (applying *Teague*).[2]

---

**1.** Supposititious is a word that works well here. "In legal contexts, *supposititious* when applied to a child means 'falsely presented as a genuine heir." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 869 (3d ed.2011). When applied to a child/juvenile like Chambers who is serving an unconstitutional mandatory sentence of life in prison without the

possibility of release, the narrow route taken by the majority appears to be a non-genuine, possibly illegitimate heir to the legal direction given to state courts like ours in *Danforth II*, 552 U.S. 264, 128 S.Ct. 1029.

**2.** Because Chambers's conviction was final when the rule in *Miller* was announced, this issue is before us on collateral as opposed to

Thus, the first potential analytical route for assessing whether *Miller* should apply retroactively is to consider the standard from *Teague.*

The Supreme Court stated that *Miller* arose from "[t]wo strands of precedent reflecting [the] concern with proportionate punishment." *Miller,* —— U.S. at ——, 132 S.Ct. at 2463. The first are cases that "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Id.* at ——, 132 S.Ct. at 2463 (citing *Graham v. Florida,* 560 U.S. at ——, 130 S.Ct. at 2022–23). The Court stated that "[s]everal of the cases in this [first] group have *specially focused on juvenile offenders, because of their lesser culpability." Id.* at ——, 132 S.Ct. at 2463 (emphasis added). The second strand that *Miller* drew on was case law where the Court has "require[ed] that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Id.* at ——, 132 S.Ct. at 2463–64 (citing *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)(plurality opinion)). In discussing these two lines of cases, the Court restated its observations on juveniles and the death penalty in *Graham v. Florida,* where the

Court "likened life without parole for juveniles to the death penalty itself." *Id.* at ——, 132 S.Ct. at 2463. "Of special pertinence," the Court stated, "we have insisted in these rulings that a sentencer have the ability to consider the 'mitigating qualities of youth.'" *Id.* at ——, 132 S.Ct. at 2467 (quoting *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)).

The foregoing framework from *Miller* makes a few points that should be central to our analysis. First, juveniles are different—their lessened culpability due to their youth means that they must be treated differently than adult offenders. *Id.* at ——, 132 S.Ct. at 2464.[3] Second, the death penalty is different—a sentencing authority *must* be able to consider individualized characteristics before a defendant may be sentenced to death. *Id.* at ——, 132 S.Ct. at 2467. And third, life in prison without parole is akin to the death penalty for juvenile offenders. *Id.* at ——, 132 S.Ct. at 2466.[4] Taken together, these three key points provide the background for us to consider whether the rule from *Miller* applies retroactively.

### A.

In *Teague,* a plurality of the Supreme Court articulated the proposition that

---

direct review. *See Teague,* 489 U.S. at 309–10, 109 S.Ct. 1060 (comparing collateral and direct review).

3. The Court reasserted its holdings from *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), that "establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most severe punishments.'" *Miller,* —— U.S. at ——, 132 S.Ct. at 2464 (quoting *Graham v. Florida,* 560 U.S. at ——, 130 S.Ct. at 2026).

4. The Court explained that a defendant's youth is a vital factor to consider during sentencing:

> Most fundamentally ... youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances [in *Graham v. Florida* ], juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken the rationales for punishment, can render a life-without-parole sentence disproportionate.

*Id.* at ——, 132 S.Ct. at 2465–66.

"new rules" only apply to cases pending on direct appeal at the time of the rule's announcement, or to cases arising after the Court announced a new rule. *Teague*, 489 U.S. at 310, 109 S.Ct. 1060. A defendant whose conviction is already final at the time a new rule is announced may not benefit from the new rule in a postconviction or other collateral proceeding. *Id.* But, the Court in *Teague* and in subsequent opinions has outlined two exceptions to this general proposition that "new rules" do not apply to convictions that are already final. The two exceptions are: (1) the new rule will apply retroactively to convictions that are final if the new rule is a substantive rule, as opposed to a procedural rule; or (2) the new rule will apply retroactively if it is a watershed procedural rule. *See Schriro v. Summerlin*, 542 U.S. 348, 351–52, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Courts that have examined the retroactivity of *Miller* have almost uniformly concluded that *Miller* adopted a new rule.[5] I agree with this conclusion and therefore I join the majority's holding that the rule in *Miller* is a new rule.

### B.

Having concluded that *Miller* adopted a new rule, the next question to answer is whether the rule in *Miller* applies retroactively. The answer to this question turns on whether either of the exceptions to the *Teague* rule applies to Chambers's sentence. Because I conclude that the rule in *Miller* is substantive rather than procedural in nature, I also conclude that the best route for us to follow is to apply the rule from *Miller* retroactively in this and other

similar cases. Moreover, our mandate to do so arises from what I believe is a simple, straight-forward application of the substantive-rule exception in *Teague* and its progeny.

In general, a rule "is substantive rather than procedural if [the rule] alters the range of conduct or the class of persons that the law punishes." *Schriro*, 542 U.S. at 353, 124 S.Ct. 2519 (citing *Bousley v. United States*, 523 U.S. 614, 620–21, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)). The Supreme Court has held that new rules "prohibiting a certain *category of punishment* for a *class of defendants* because of their *status or offense*" are substantive. *See Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (emphasis added), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Court has stated that substantive rules "apply retroactively because they necessarily carry a significant risk that a defendant [1] stands convicted of an act that the law does not make criminal or [2] faces a punishment that the law cannot impose" upon him because of the offense the defendant stands convicted of or the class to which the person being punished belongs. *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519 (internal quotation marks omitted). A new rule that "modifies the elements of an offense is normally substantive rather than procedural." *Id.* at 354, 124 S.Ct. 2519.

In *Schriro*, the Supreme Court considered whether the new rule it announced in *Ring v. Arizona* applied retroactively. *Id.* at 349, 124 S.Ct. 2519; *see also Ring v.*

---

**5.** *See e.g., Gonzalez v. State,* 101 So.3d 886 (Fla.Dist.Ct.App.2012); *Geter v. State,* No. 3D12–1736, 115 So.3d 375, 2012 WL 4448860 (Fla.Dist.Ct.App. Sept. 27, 2012); *People v. Davis,* No. 1–11–2577, 2012 WL 6863262 (Ill.App.Ct. Dec. 28, 2012) (order);

*People v. Williams,* 367 Ill.Dec. 503, 982 N.E.2d 181 (Ill.App.Ct.2012); *People v. Morfin,* 367 Ill.Dec. 282, 981 N.E.2d 1010 (Ill. App.Ct.2012); *People v. Carp,* 298 Mich.App. 472, 828 N.W.2d 685 (2012).

*Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In *Ring,* the Court held that Arizona's process for sentencing a defendant to death was invalid because a judge, sitting without a jury, could find the aggravating circumstances necessary for imposing the death penalty. *Ring,* 536 U.S. at 588–89, 122 S.Ct. 2428. The Court concluded that the Sixth Amendment requires that a jury make such a finding. *Id.* at 609, 122 S.Ct. 2428. In *Schriro,* the Court concluded that the rule from *Ring* was procedural, rather than substantive. *Schriro,* 542 U.S. at 353, 124 S.Ct. 2519. The Court based this conclusion on three factors. First, the Court concluded that *Ring* had not "alter[ed] the range of conduct" that was subject to the death penalty. *Id.* Second, the Court concluded that *Ring could not* have altered the range of conduct because the holding in *Ring* was based on the Sixth Amendment's jury-trial guarantee, which has "nothing to do with the range of conduct a state may criminalize." *Id.* The Court then concluded that the jury-trial guarantee is essentially procedural in nature. *Id.* Finally, the Court held that *Ring* had altered the "range of permissible methods" for determining punishment and that "[r]ules that allocate decisionmaking authority in this fashion are prototypical procedural rules." *Id.*

The factors that the Supreme Court outlined in *Schriro* for comparing substantive and procedural rules lead me to conclude that the rule in *Miller* is distinguishable from the rule in *Ring* and that the *Miller* rule is substantive in nature. First, *Miller* not only altered the "range of conduct" that is punishable by life imprisonment, *Miller* prohibited life imprisonment without release for juveniles absent the additional consideration of a juvenile defendant's " 'lessened culpability' " and "greater 'capacity for change.' " *Miller,* ── U.S. at ──, 132 S.Ct. at 2460 (quoting *Graham v. Flori-*

*da,* 560 U.S. at ──, 130 S.Ct. at 2026–27, 2029–30). The Court concluded that any punishment must be "graduated and proportioned to both the offender and the offense." *Miller,* ── U.S. at ──, 132 S.Ct. at 2463 (internal quotation marks omitted). Thus, *Miller* changed the range of permissible punishment—no mandatory life imprisonment without the possibility of release—based on the *offense at issue* and the *class of offender* at issue. *See Schriro,* 542 U.S. at 352–53, 124 S.Ct. 2519. In sum, the change in *Miller* is substantive, at least in part, because Chambers is serving a sentence that the State may not be able to impose on him.

Second, unlike the procedural change at issue in *Schriro, Miller* was decided under the Eighth Amendment. This distinction is significant. By no means does every challenge under the Eighth Amendment involve a substantive rather than procedural rule. For example, in *Graham v. Collins,* the Supreme Court held that the mechanism by which a jury considers mitigating evidence is procedural, rather than substantive. 506 U.S. 461, 477, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). But the categorical barrier that is present when considering new rules applying the Sixth Amendment and which precludes a conclusion that such rules are substantive is absent here. This distinction sets Chambers's case apart from *Schriro,* as well as from our recent decision in *Campos. See Campos,* 816 N.W.2d at 488–99 (considering and rejecting the retroactive application of *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), which involved Sixth Amendment rights).

Finally, *Miller* not only altered the "range of permissible methods" by which a juvenile can be punished, it created what functions as a new element that must be considered before a juvenile may be sen-

tenced to life imprisonment without release. While *Miller* did not create a categorical ban on the proscribed punishment of life in prison without the possibility of release for a juvenile, the Court in *Miller* did identify a class of persons for whom the State must allow consideration of additional elements before that punishment can be imposed. *See Miller*, — U.S. at —, 132 S.Ct. at 2469. Thus, the elements required for mandatory life imprisonment without release were modified— which the Court in *Schriro* identified as a signal of a substantive rule. *See Schriro*, 542 U.S. at 354, 124 S.Ct. 2519.

The following observation should help to demonstrate why the rule in *Miller* establishes what functions as an additional element that must be satisfied before a court can sentence a juvenile to life without the possibility of parole. If *Miller* represents a reallocation of procedural decision-making authority, then the body making the requisite "decision" that *Miller* requires should be readily identifiable. For instance, the rule in *Ring* reallocated decision-making from the judge to the jury. *Ring*, 536 U.S. at 609, 122 S.Ct. 2428. The rule in *Padilla* reallocated from defense counsel to the defendant any decision-making based on information about the immigration implications of a guilty plea. *See Campos*, 816 N.W.2d at 485–87. And in *Graham v. Collins*, the Court held that an extension of the rule in *Penry v. Lynaugh* was procedural in nature because it would alter the manner in which a jury is instructed to consider mitigating circumstances. *Graham v. Collins*, 506 U.S. at 477–78, 113 S.Ct. 892. No such reallocation of decision-making can be identified in *Miller*. The sentencing statutes invalidated under *Miller* explicitly barred the consideration of mitigating circumstances particular to juvenile offenders from being taken into account whatsoever, consideration of which is now mandated under *Miller*. This additional element renders the rule from *Miller* substantive in nature, rather than merely a procedural rule that reallocates decision-making authority.

The majority states that *"Miller* simply imposes a new procedure in which the sentencing judge must consider the youthfulness of the offender." *Supra* at 328 n. 10. I acknowledge that nearly all aspects of the law contain an element of procedure; but, by saying that *"Miller* simply imposes a new procedure," the majority cannot and should not ignore that no judicial decision maker in Chambers's case has yet addressed what the Supreme Court says is now required before life in prison without the possibility of release may be imposed on a juvenile offender like Chambers. Under *Miller*, to quote the majority, the decision whether to impose life in prison without release "must consider the youthfulness of the offender." *Supra* at 328 n. 10. Unless consideration of an offender's youthfulness is merely pro forma—in which case *Miller*'s holding provides illusory relief—then the majority's contention that the State retains "the ultimate power . . . to impose the punishment in question" cannot be justified on the record before us. Under *Miller*, before the State may impose a sentence of life in prison without the possibility of release on a juvenile offender, the sentencing body *must make individualized* findings because "youth matters for purposes of meting out the law's most serious punishments"—a sentence that is akin to the death penalty. *Miller*, — U.S. at —, 132 S.Ct. at 2471. No such findings exist in Chambers's case and therefore any assertion that the State could impose Chambers's sentence upon him if he were sentenced today is, at best, speculation. More is required to be put on the record before the State may impose such a sentence on *any* juvenile offender. There-

fore, the concern articulated in this dissent, that Chambers's may well be serving a sentence that the State could not impose upon him, is well founded.

An additional factor that strongly counsels in favor of concluding that the rule in *Miller* is substantive in nature and, thus is retroactive, is that the rules in the line of cases leading up to *Miller* have almost universally been held to be substantive rules. The Supreme Court stated that the rule in *Miller* arose from "two strands of precedent reflecting our concerns with proportionate punishment." *Miller*, —— U.S. at ——, 132 S.Ct. at 2463. One strand of cases focuses on limiting punishment for classes of defendants with lessened culpability due to their status. *Id.* In *Atkins v. Virginia*, the Court banned capital punishment for "mentally retarded" defendants. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). That opinion led to *Roper*, where the Court banned capital punishment for children. 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1. Then in *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the Supreme Court "likened life without parole for juveniles to the death penalty itself." *Miller*, —— U.S. at ——, 132 S.Ct. at 2463 (discussing the reasoning in *Graham v. Florida*). The Court restricted the types of offenses for which juveniles can be sentenced to life in prison without release. *Graham v. Florida*, 560 U.S. at ——, 130 S.Ct. at 2034 (limiting such a sentence to homicide offenses).

The Court's new rule in *Miller* arises from the Court's existing precedent in *Atkins, Roper*, and *Graham v. Florida. Miller*, —— U.S. at ——, 132 S.Ct. at 2463. The Federal Courts of Appeals that have

looked at the retroactivity of the rules articulated in *Atkins, Roper*, and *Graham v. Florida* have unanimously held that those rules are substantive in nature and thus apply to collateral appeals.[6]

The majority is only able to discern a procedural reallocation of decision-making when it analyzes the Supreme Court's holding in *Miller*. Yet, the majority cannot, nor can anyone, identify which sentencing body was previously making the individualized determination now required before a juvenile, like Chambers, may be given the equivalent of the death penalty— life in prison without the possibility of release. But new rules where no prior decision was rendered under the rule are exactly the types of rules that the Supreme Court has stated *are* retroactive, because "they necessarily carry a significant risk that a defendant ... faces a punishment that the law cannot impose upon him" any longer. *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519. Therefore, because *Miller* "prohibit[ed] a certain category of punishment," (mandatory life imprisonment without the possibility of release) "for a class of defendants because of their status," (juveniles), *see Penry*, 492 U.S. at 330, 109 S.Ct. 2934, I conclude that the rule in *Miller* is substantive in nature and would hold that, under the substantive-rule exception in *Teague*, it applies retroactively.

## II.

While I conclude that the best analytical route to take when deciding this case is to hold that, under the principles of *Teague*, the rule from *Miller* should apply retroac-

---

**6.** *See, e.g., In re Moss*, 703 F.3d 1301, 1303 (11th Cir.2013) (*Graham v. Florida*); *Hooks v. Workman*, 689 F.3d 1148, 1183 n. 18 (10th Cir.2012) (*Atkins*); *Black v. Bell*, 664 F.3d 81, 92 (6th Cir.2011) (*Atkins*); *In re Sparks*, 657 F.3d 258, 262 (5th Cir.2011) (*Atkins, Roper*, and *Graham v. Florida*); *Allen v. Buss*, 558 F.3d 657, 661 (7th Cir.2009) (*Atkins*); *Pizzuto v. Arave*, 432 F.3d 1028, 1029 (9th Cir.2005) (*Atkins*); *Davis v. Norris*, 423 F.3d 868, 879 (8th Cir.2005) (*Atkins*); *In re Holladay*, 331 F.3d 1169, 1172–73 (11th Cir.2003) (*Atkins*).

tively, I do acknowledge that, as Niels Bohr indicated, "[p]rediction is very difficult, especially about the future."[7] As previously noted, I believe the majority is acting out of an overabundance of caution because of its concern over how the Supreme Court will decide the question of *Miller*'s retroactive application. Even if the majority is justified in its concern about predicting whether the Supreme Court will apply *Miller* retroactively, that concern does not mandate the result the majority has reached today. There is another valid route for us to follow.[8]

The Supreme Court has provided us with a second route to take which will allow us to remand to the postconviction court. More specifically, the Court has explicitly stated that, as the state court that is charged with interpreting and applying Minnesota's Constitution and criminal laws, we are not bound by *Teague* when making determinations about whether rules apply retroactively under state law. *Danforth II*, 552 U.S. at 266, 128

S.Ct. 1029 (stating that *Teague* does not "constrain[ ] the authority of state courts to give broader effect to new rules of criminal procedure than is required" in the federal habeas context by *Teague* ).

In *Danforth I*, our court held that we were bound by the principles set forth in *Teague* when we considered whether new rules of criminal procedure apply retroactively to convictions on collateral review. 718 N.W.2d at 456–57. The Supreme Court reversed our court in *Danforth II*, holding that the *Teague* principles were specific to the context of federal habeas petitions and, therefore, were not binding on state courts applying state law. 552 U.S. at 277–81, 128 S.Ct. 1029. On remand, our court nonetheless elected to tether itself to *Teague*. *Danforth III*, 761 N.W.2d at 498–500.

As I acknowledged in *Danforth III*, there are aspects of *Teague* that are "sound in principle." *Id.* at 500 (Anderson, Paul H., J., dissenting) (internal quotation marks omitted). Specifically,

---

**7.** The sentiment in this quote has also been expressed, famously, by Yogi Berra, who said, "It's tough to make predictions, especially about the future," as well as Casey Stengel, whose phrasing was, "Never make predictions, especially about the future."

**8.** In his concurrence, Justice G. Barry Anderson concludes that the issues in this case are better left for another day. My colleague's perspective on this issue adds both substance and context to our discussion; and, I understand his desire to keep his powder dry on the ultimate issue—the retroactivity of *Miller.* The concurrence's position finds some support in our precedent, even precedent I have authored. *See Minn. Twins P'ship v. State ex rel. Hatch,* 592 N.W.2d 847, 856 (Minn.1999) ("[T]his court is not the forum in which this tangled web ought to be unsnarled. Professional baseball's exemption from antitrust laws may be an aberration, but we agree with those courts that believe the Supreme Court should retain the exclusive privilege of overruling its own decisions." (citations omit-

ted) (internal quotation marks omitted)). That said, the concurrence does nothing to dissuade me from my conclusion that the majority's approach is not the right one to take in this case. The position of the concurrence, as well as the majority, is laden with what I previously noted as an overabundance of caution. Unlike *Minnesota Twins*, a case where we would have had to depart from longstanding Supreme Court precedent that had stood in place unaltered from 1922 through 1999— this dissent's position *adheres* to Supreme Court precedent. There is sufficient Supreme Court precedent to conclude that *Miller* is substantive and therefore applies retroactively. The overabundance of caution by both the majority and the concurrence about predicting what the Supreme Court may do in the future—an endeavor aptly captured by the quotes from Niels Bohr, Casey Stengel, and Yogi Berra—ignores the issue addressed in the second section of this dissent. More specifically, the Supreme Court has explicitly told us we have the freedom to decide retroactivity under our own criminal law.

*Teague* properly addressed the valid concern that the finality of convictions should not be unnecessarily disturbed. *Id.* The retroactivity standard that was in effect before *Teague*—the *Linkletter–Stovall* standard—led to too much variation between cases and was justifiably criticized for turning "courts into legislatures." *Id.* (citing *Desist v. United States,* 394 U.S. 244, 257, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)). But, while the policy interests of finality and uniformity that *Teague* addresses are important, they are not the only policy interests that we should be concerned with when deciding cases that involve constitutional safeguards. In a criminal prosecution, where an individual's liberty is at stake, the interests of finality and uniformity should never trump the government's interest "that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The virtues of the doctrine of finality can become hollow and meaningless when an individual's rights under the constitution are directly implicated. As I said previously, I am concerned that "the Supreme Court has applied the *Teague* rule so narrowly and strictly that many cases involving constitutional safeguards that warrant collateral review have not *or will not* receive such review." *Danforth III,* 761 N.W.2d at 500 (Anderson, Paul, J., dissenting) (emphasis added). Nothing that has happened in the interim causes me to change my mind or lessen the concern I expressed in *Danforth III.*

I continue to have no doubt that, by adopting *Teague,* our court erected an unnecessary—and unnecessarily harsh—self-imposed barrier that is both "too narrow and strict in its application." *Id.* at 502. I now know that my concerns were justified. Today is the day that this narrow, strict, and unnecessary rule leads the majority to refuse to enforce a "constitutional safe-guard[ ] that warrant[s] collateral review." *Id.* at 500. Despite the majority's statement that the dissent is "reframing" the issue before us—followed immediately by the majority's own framing of the issue—there is indisputably one issue before us and it cannot be ignored. Today the majority retreats behind its self-imposed barrier and leaves in place a sentence that the State of Minnesota *could not* impose on Chambers if the State were to attempt to do so today.

The stark reality of this change in circumstance requires that a court reassess Chambers's sentence. The Supreme Court has compared Chambers's mandatory sentence, which the majority elects to leave untouched, to the death penalty itself, and has unequivocally held that such a sentence constitutes cruel and unusual punishment. All Minnesota citizens are entitled to have their rights under both the federal and state constitutions vindicated. Minnesotans are entitled to protection from the infliction of "cruel and unusual punishments" under the Eighth Amendment of the United States Constitution and from "cruel or unusual punishments" under article 1, section 5 of the Minnesota Constitution. The majority's refusal to issue a remand to the postconviction court so that Chambers can be resentenced in compliance with either the United States or Minnesota Constitutions is simply beyond me. I would accept the invitation of the Supreme Court to untether our jurisprudence from the federal habeas standard in *Teague* when applying our state law in a case like the one before us today. For the reasons outlined in this section, I would interpret our holding in *Danforth III* such that the new rule from *Miller* applies retroactively.

## III.

There is yet a third route that is available in this case—fundamental fairness in

the interests of justice. In *Danforth III*, we stated that we were "mindful of the criticism ... that the *Teague* rule has been applied so strictly by the United States Supreme Court 'that decisions defining a constitutional safeguard rarely merit application on collateral review.'" 761 N.W.2d at 500 (quoting *Colwell v. State*, 118 Nev. 807, 59 P.3d 463, 471 (2002)). Because the *Teague* rule does not constrain our authority to give broader effect to new rules of criminal procedure, we recognized that "we are not bound by the U.S. Supreme Court's determination of fundamental fairness." *Id.* We then stated, in no uncertain terms, that "we will independently review cases to determine whether they meet our understanding of *fundamental fairness.*" *Id.* (emphasis added).

By any stretch of the imagination, the result reached by the majority in this case is inconsistent with fundamental fairness. Chambers was given a sentence that constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. We have long recognized that we have the "supervisory power to insure the fair administration of justice." *State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994). We have, in rare and extraordinary cases, exercised that power because "[i]t is our duty to supervise the criminal justice system." *State v. Windish*, 590 N.W.2d 311, 319 (Minn.1999). We have exercised our supervisory power to reverse convictions prophylactically and in the interests of justice based on prosecutorial misconduct. *See State v. Porter*, 526 N.W.2d 359, 366 (Minn.1995). We have allowed a criminal defendant to withdraw a guilty plea and have a trial. *See Shorter v. State*, 511 N.W.2d 743, 747 (Minn.1994). We have required the provision of counsel to indigent defendants in criminal cases, *see State v. Borst*, 278 Minn. 388, 397, 154 N.W.2d 888, 894 (1967), and civil cases, *see Hepfel v. Bashaw*, 279 N.W.2d 342, 348

(Minn.1979); and we have required that certain kinds of proceedings take place, *State ex rel. Doe v. Madonna*, 295 N.W.2d 356, 365 n. 17 (Minn.1980).

Without question, the precise contours of our supervisory power are not easily delineated. *State v. Beecroft*, 813 N.W.2d 814, 867 (Minn.2012) (Stras, J., dissenting). But the thread that binds our court's interests—of-justice jurisprudence is, in my view, quite simple: our court must, at times, act as a backstop—the court of last resort—to protect "the human, political, and property rights guaranteed by the constitution." *In re Petition for Integration of the Bar of Minn.*, 216 Minn. 195, 199, 12 N.W.2d 515, 518 (1943). Those words, written by our court seven decades ago, are still applicable today and are applicable to Chambers. This case squarely implicates our supervisory powers because if we fail to act, then Chambers will spend the remainder of his life serving a sentence that the Supreme Court has deemed unconstitutional.

In *Danforth III*, we left open a narrow window—too narrow in my view, but a window nonetheless—to account for a case like the one we confront today. And consistent with the rule we announced in *Danforth III*, I conclude, based on a careful review of the facts and circumstances here, that denying Chambers the benefit of the new rule announced by the United States Supreme Court in *Miller* is inconsistent with fundamental fairness.

I acknowledge that Chambers's underlying conviction has been previously reviewed and upheld by our court and that the murder of Deputy Sheriff John Liebenstein was a horrible and despicable act. But it is ill-advised for two reasons, one major and one minor, to use Chambers's statement that "if the cop wanted to be a hero he would die a hero," and similar

facts of this case to support the majority's rationale. The minor reason is that no matter how horrible and despicable Chambers's statement may be, it is a statement that also reflects the bravado of youth, the very same "'lack of maturity and [ ] underdeveloped sense of responsibility' leading to recklessness, impulsivity, and heedless risk-taking" that has led the Supreme Court to hold that "children are constitutionally different from adults for purposes of sentencing." *Miller,* —— U.S. at ——, 132 S.Ct. at 2464 (quoting *Roper,* 543 U.S. at 569, 125 S.Ct. 1183).

The other reason, the major reason, why the use of Chambers's statement and other facts specific to his case is ill-advised, is that today's decision not only affects Chambers, but at least six other juvenile offenders in Minnesota who are serving mandatory sentences of life in prison without release. There are six juvenile offenders serving sentences that could not be imposed following *Miller* absent additional, individualized development of the record in their respective cases. Further, there are perhaps hundreds of other similarly situated defendants in other states who will also grapple with the retroactivity of *Miller.* These defendants and the courts in their respective states may look to our court's decision in this case for direction because we are one of the first state supreme courts to have addressed this specific question.

In sum, I cannot abide by the result reached by the majority today. For all the reasons I have articulated in this dissent, I conclude that the majority's holding: (1) is inconsistent with the substantive-rule exception under *Teague;* (2) ignores the Supreme Court's invitation to us as a state court to apply our state law separately from the federal habeas standard articulated by the Court in *Teague;* and (3) is incompatible with our

concept of what constitutes fundamental fairness in Minnesota. Therefore, I would reverse the postconviction court and remand to that court for the imposition of a sentence that is neither cruel nor unusual under the United States and Minnesota Constitutions.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul Anderson. I write separately, however, because I would be remiss if I did not point out that, by its decision today, the court fails in carrying out one of our most basic responsibilities. At the core, our court is responsible for ensuring that justice is done. In the case of Timothy Chambers, justice has not been done.

I.

For the reasons stated in Justice Paul Anderson's dissent, I disagree with the court's conclusion that the United States Supreme Court's decision in *Miller v. Alabama,* 567 U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012)—prohibiting mandatory life imprisonment without the possibility of release for juvenile offenders—should not apply retroactively because of the rule articulated by the Supreme Court in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and adopted by our court in *Danforth v. State,* 761 N.W.2d 493 (Minn.2009).

Under *Teague,* a new constitutional rule of criminal procedure is retroactive if it "prohibited imposition *of a certain type of punishment for a class of defendants because of their status* or offense." *Danforth,* 761 N.W.2d at 496–97 (alteration omitted) (emphasis added). That is precisely what happened here. *Miller*

prohibited the mandatory imposition of life without the possibility for release on a particular class of defendants (juveniles) because of their age. The court contends that this retroactivity principle does not apply in this case because *Miller* did "not *eliminate* the power of the State to impose the punishment of life imprisonment without the possibility of release upon a juvenile offender who has committed a homicide offense," but rather merely required that the court "follow *a certain process*" before doing so. But this ignores the realities of Minnesota law. In Minnesota, a district court has no statutory authority to conduct such an individualized analysis in the case of a defendant who commits first-degree murder of a peace officer. Put differently, under Minnesota law, there is no such "certain process." At the time of his offense, the only sentence that could be imposed on Chambers for his offense was life without the possibility of release. *See* Minn.Stat. §§ 609.106, subd. 2(1), 609.185(a)(4) (2012). Because the Legislature made the sentence mandatory, there is no place for an individualized determination or discretion of any kind. Therefore, when *Miller* categorically barred the mandatory imposition of life imprisonment without the possibility of release, it eliminated, in the words of the court, "the power of the State to impose the punishment of life imprisonment without the possibility of release upon a juvenile offender." [1] *Supra* at 328–29. As a consequence, *Miller* should be retroactive under *Teague.*

Moreover, *Teague* is the standard we apply for determining the "retroactivity of new rules of constitutional criminal *proce-*

*dure* set by the United States Supreme Court." *Danforth,* 761 N.W.2d at 494 (emphasis added). But, as Justice Paul Anderson's dissent points out, *Miller* was decided under the Eighth Amendment and deals with the kinds of punishments that legislatures can constitutionally impose. Under the separation of powers, while this court has primary authority for matters of *procedure,* the Legislature has primary authority for matters of *substance. See State v. Lindsey,* 632 N.W.2d 652, 658 (Minn.2001). Among the Legislature's substantive authority is the "power to define the conduct which constitutes a criminal offense and to fix the punishment for such conduct." *See State v. Olson,* 325 N.W.2d 13, 17–18 (Minn.1982); *see also State v. Witt,* 310 Minn. 211, 215, 245 N.W.2d 612, 615–16 (1976). In other words, we have held that the kind of sentence that a defendant can serve is a quintessential matter of substance. And because it is a matter of substance, *Teague,* by its own terms, is not a bar to applying *Miller.*

Further, as the court notes, *Danforth's* adoption of the *Teague* standard for retroactivity is based almost exclusively on principles of "finality." But the finality discussed in *Danforth* is specifically "the finality of *convictions.*" 761 N.W.2d at 498 (emphasis added). In other words, we were concerned with the finality of determinations of *guilt or innocence,* not with the finality of sentences. *See id.* at 498–99 (noting the concern that retroactive rules will require burdensome retrial of defendants through the testimony of witnesses whose memories have dimmed, and making numerous references to the *trial* of the defendant). In this case, finality concerns

---

**1.** Of course, if the Legislature were to amend the statute to make the imposition of a sentence of life imprisonment without the possibility of release for juveniles discretionary, courts would have the ability to make an individualized determination before imposing such a sentence and the punishment would no longer be beyond the power of the state to impose. At the time Chambers' sentence was imposed, however, an individualized determination was not permissible because the sentence was mandatory, not discretionary. Therefore, at least with respect to Chambers, the punishment simply cannot be imposed.

are diminished to the point of nonexistence. Application of the Supreme Court's rule from *Miller* will simply not undermine or otherwise impact Chambers' conviction. It would merely affect a sentencing issue: whether Chambers may one day be eligible for release. Chambers will stand convicted of first-degree murder and serve a life sentence either way.

Finally, it is not clear to me that the rule set out in *Teague* applies to Chambers' sentence. The Minnesota Rules of Criminal Procedure provide that "[t]he court may at any time correct a sentence not authorized by law." Minn. R.Crim. P. 27.03, subd. 9. Given the Court's decision in *Miller*, there can be no question that Chambers' sentence is not authorized by law. Thus, under Rule 27.03, subdivision 9, the court has authority to correct Chambers' sentence. It simply chooses not to exercise that authority.[2]

## II.

I also agree with Justice Paul Anderson that we should revisit our decision in *Danforth* and accept the United States Supreme Court's invitation to adopt a dif-

ferent standard governing the retroactive application of new constitutional rules. But even if we decline to revisit *Danforth*, ignore *Teague*'s exception for prohibited imposition of punishment for a certain class of defendants because of their status, and apply the *Teague* rule to the Supreme Court's rulings on substantive constitutional law, I would nonetheless depart from the *Teague* rule in cases such as this one. *Teague* should not apply in situations, like here, in which the defendant on direct appeal challenges his sentence as unconstitutional, we erroneously reject that challenge, and the United States Supreme Court subsequently corrects our error.

Following his conviction, Chambers filed a direct appeal in our court. Among the arguments he raised was the claim that "the *mandatory* sentence of life imprisonment without parole as applied to [a] 17–year–old ... violates the constitutional prohibition of cruel or unusual punishment."[3] *State v. Chambers*, 589 N.W.2d 466, 473 (Minn.1999) (emphasis added). We rejected that argument and concluded that the sentence imposed did not violate

---

**2.** I recognize that we have applied *Teague* to sentencing matters before in *O'Meara v. State*, 679 N.W.2d 334, 338 (Minn.2004) (considering retroactive application of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)), *overruled in part by Danforth v. Minnesota*, 552 U.S. 264, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), and *State v. Losh*, 721 N.W.2d 886, 898 (Minn.2006) (considering retroactive application of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)). But these cases are distinguishable for several reasons. Most importantly, both were decided before the Supreme Court made clear that state courts were free to depart from *Teague* in determining the retroactivity of new constitutional rules, *see Danforth*, 552 U.S. at 266, 128 S.Ct. 1029, and thus they do not analyze the extent to which the state's interest in finality applies to sentencing issues. Moreover, the issue in those cases was whether the defendants' case had become final or whether it was still pend-

ing on direct review, an issue not in dispute in this case. *See Losh*, 721 N.W.2d at 893–95; *O'Meara*, 679 N.W.2d at 339–40. Neither the defendant in *O'Meara* or in *Losh* had argued on direct review for the application of the very constitutional rule they sought to have applied retroactively.

**3.** The court contends that Chambers' argument on direct appeal was that the imposition of life imprisonment without the possibility of release on a juvenile was categorically unconstitutional, not that it was unconstitutional because it was mandatory. The court can parse the argument raised by Chambers and the words of our *Chambers* opinion on direct appeal all it wants, but it cannot escape the fact that the statute under which Chambers was sentenced, Minn.Stat. § 609.106, subd. 2(1), is categorically unconstitutional. Section 609.106 *mandated* the imposition of life without the possibility of release for Chambers'

either the federal or state constitution. *Id.* at 480.

As it turns out, we got it wrong. The one who did not get it wrong was Chambers. In *Miller*, the Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition against 'cruel and unusual punishments.'" 132 S.Ct. at 2460. The Court noted that, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," the mandatory imposition of life without the possibility of release "poses too great a risk of disproportionate punishment." *Id.* at 2469.

Had we accepted Chambers' argument in 1999—as we should have—Chambers would, at a minimum, have been entitled to a hearing to determine whether life imprisonment without the possibility of release (as opposed to life *with* the possibility of release) was the appropriate punishment for him considering all the circumstances, including his age.[4] Instead, we allowed an unconstitutional sentence to stand. Now, confronted with the opportunity to correct our error, we decline to do so. In declining to correct our error, we ground our decision in procedural purity, relying on our adoption of the *Teague* test for determining retroactivity. *See Danforth,* 761 N.W.2d at 498–500. As a result, Chambers has paid, and continues to pay, the price for our error. He is required to serve a sentence imposed under a sentencing scheme that violates the United States Constitution.

Justice and fairness require that a defendant, who timely and properly objects to his sentence based on a correct interpretation of the constitution, be granted the protections of the constitution notwithstanding the misfortune of having a court erroneously reject his interpretation on direct appeal. No defendant should have to pay for our mistakes. We noted in *Danforth* our concern that, if we applied a broader retroactivity test than *Teague,* "limited judicial resources may be expended litigating the convictions of defendants who never challenged" the alleged unconstitutional practice. *See* 761 N.W.2d at 499. That concern is simply not present here because Chambers *did* directly challenge the mandatory imposition of life without the possibility of release against a juvenile offender.

In sum, justice requires, at a minimum, that Chambers have a resentencing hearing. We have the power to grant that

crime, and Chambers challenged the application of that statute to him because of his status as a juvenile. The court's suggestion that his constitutional challenge to the statute did not encompass an objection to the mandatory nature of the punishment is without merit.

4. While, at a minimum, I would remand to the district court for a resentencing hearing, I note, as discussed above, that I would hold that Chambers' sentence should automatically be converted to a life sentence with the possibility of release. No one disputes that the statute authorizing the sentence of life without release—Minn. Stat. § 609.106, subd. 2(1)—is unconstitutional as applied to people such as Chambers who were juveniles at the time they committed their crime. *See Miller,*

—— U.S. at ——, 132 S.Ct. at 2460. With that statute being unconstitutional, the only other sentence that the district court was statutorily authorized to impose at the time of Chambers' offense for first-degree murder was the mandatory sentence of life with the possibility of release. *See* Minn.Stat. § 609.185(a) (2012). Minnesota law did not then and does not now provide for any judicial discretion when sentencing a defendant convicted of first-degree murder for the killing of a peace officer. Our court has no authority to impose a new sentencing rule on a defendant whose punishment was fixed at the time his offense was committed. Therefore, a hearing is unnecessary and life with the possibility of release should be imposed.

relief to Chambers, *Teague* notwithstanding. As we have long recognized, absent a jurisdictional bar, we have the inherent authority to consider the merits of an argument on appeal in the interests of justice. *See In re Welfare of J.R.,* 655 N.W.2d 1, 3 (Minn.2003). The interests of justice cry for us to grant relief here. Our failure to grant relief means that we have failed at our core responsibility of ensuring that justice is done. In this case, justice has not been done.

Therefore, I respectfully dissent.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Page.